**Herman A. STARCKE, Employee-Respondent,**

v.

**KREY PACKING COMPANY, Employer, Self-Insured, Appellant.**

**No. 32847.**

St. Louis Court of Appeals.

Missouri.

Feb. 20, 1968.

Motion for Rehearing or to Transfer to Supreme Court Denied March 21, 1968.

Application to Transfer Denied May 13, 1968.

R. C. Reis, St. Louis, for appellant.

Max M. Librach and Gene R. Spengel, Jr., St. Louis, John B. Busch, Clayton, for respondent.

TOWNSEND, Commissioner.

This Workmen's Compensation proceeding was initiated by Herman A. Starcke's filing of claim for compensation with the Division of Workmen's Compensation on January 10, 1964. In his claim he alleged injuries to his left hip, left leg, left ankle and back resulting from an accident suffered on January 24, 1963. Hearing before the Referee was had on October 25, 26, 27 and November 1, 1965. At the hearing it was stipulated, inter alia, that no compensation had been paid for temporary total disability, that no time was lost and none claimed, that medical aid had been furnished by the employer in the amount of $35.00 and no claim was being made by the employee for additional medical. The Referee awarded claimant for permanent partial disability the sum of $42.50 per week for eighty weeks. Upon the employer's Application for Review the Industrial Commission affirmed the award of the Referee. In turn, upon appeal, the Circuit Court of St. Louis affirmed the action of the Industrial Commission.

At the hearing before the Referee the claimant testified in substance as follows: At about 11 p. m., January 24, 1963, while engaged in his duties as a stationary engineer for the employer he slipped on the ice in an alley on the employer's premises and fell with heavy impact on his left hip and upper thigh. He arose unassisted and worked the balance of his shift. He was bothered only by the soreness of his hip at that time. He states that the next day his leg had turned black from the ankle to the hip; he reported to the nurse at the company dispensary and was given some pills. He was having no trouble with any part of his body other than his leg at this time. He continued to do his regular type of work, although his leg was sore and he was limping a little. His back started "bothering" him the second or third day after the fall. About two days after the fall claimant called Doctor Donley, a company physician, and went to his office on Grand Avenue. Doctor Donley gave him a prescription for some pills "to dissolve that blackness in the leg". The doctor took no x-rays at this time. When asked when he first started having pains in his back, claimant answered "I would say seven or eight days after that." Eight or ten days after the initial visit to Doctor Donley he saw the doctor again (apparently at the dispensary) and was given a hypodermic shot by the nurse at the doctor's direction. He was in the dispensary eight or ten times thereafter, receiving some kind of light and heat treatment on his hip, over a period of eight or nine months. Claimant was hospitalized for pneumonia in March 1963, but otherwise he lost no time from work between the day of his accident in January and the termination of his employment in October 1963. At the time of this pneumonia incident claimant made no complaint to his physician of any back trouble, nor did he do so when the same physician treated him for a virus in January 1964. He saw Doctor Donley a third time about a year after the fall and at that time he was sent to Christian Hospital for x-rays.

About eight years before the time of the hearing claimant started seeing Doctor Yochum, a chiropractor, because he then had "sciatica rheumatism", a matter that cleared up in about twelve days after he first visited Doctor Yochum. Thereafter he visited the chiropractor sporadically when he "didn't feel too good" or had body aches. There might have been intervals of six to eight months between some visits. Claimant received a traction treat-

ment each time he visited Doctor Yochum, but upon no such visit prior to the accident in question here was he complaining of back pains. The last time the witness saw Doctor Yochum prior to the accident was one and a half to two months before. At that time he "gave me manipulation for the back and gave me traction", although he was having no difficulty with his back at that time. About six months after the accident he went to Doctor Yochum because his back was bothering him and between that time and February 1964 he visited him from twelve to fourteen times.

Throughout his examination claimant testified to the continuing and persistent soreness in his hip and back up to the time of the hearing.

The attendant nurse at the dispensary testified that the claimant did not appear at the dispensary until January 28, 1963. Thereafter he was at the dispensary nine times by May 21, 1963, but did not appear there between May 21 and October 25, 1963. During the whole of this period claimant never complained of his back hurting him. On October 30, 1963, Doctor Donley, company physician, sent the claimant to Christian Hospital for x-rays; the order for x-rays related only to the area of the thigh and no x-ray was taken of the back. The report from the radiologist at Christian Hospital was negative; however it did disclose an arthritic condition. On the last previous occasion of claimant's visit to the dispensary, namely, on October 25, 1963, when the claimant was seen by Doctor Donley he stated that he still had pain in the left upper lateral thigh six to eight inches below hip trochanter.

Doctor Donley testified that he first saw claimant about January 28, 1963. Upon examination he found that there was a bruise over the left hip area with hematoma formation. Thereafter he saw claimant "pretty often * * *. He would come into the dispensary when I was there." At no time did claimant complain of any pain in his back; his references were always to the hip. On September 18, 1964, approximately eleven months after claimant's employment with the packing company had terminated, he was sent to Doctor Donley for a rating. At that time claimant stated that his hip condition had improved, but he also had other complaints, such as pain along the side of the thigh and into the left lower leg. He also complained of some pain in the low back region. This was the only occasion upon which claimant had complained of any pain other than the pain in the hip region.

It is clear that if the Commission's award of permanent partial disability were based upon the injury to the claimant's hip alone, there was not sufficient evidence to justify the award. Claimant's medical witnesses, after examination and x-rays, testified (1) that the x-ray of claimant's hip showed no pathology there and (2) that there was no restricted motion of either hip, that there was some palpable tenderness over the left greater trochanter and that witness made no objective findings with regard to the left thigh; there was no pathology associated with the hips. Accordingly, the Commission's award must have been founded upon the alleged back injuries alone or upon the combination of back and hip injuries.

Apart from claimant's own testimony the only evidence of injury to his back came from his two medical witnesses. The substance of their testimony follows.

Dr. Harry I. Berland, radiologist at St. Louis State Hospital, testified that on January 15, 1965, he x-rayed the lumbosacral spine and the left hip of claimant. The x-rays showed spur formations on the margins of the lumbar and lower dorsal vertebrae and a narrowing of the right side of the first lumbar vertebra and of the second lumbar vertebra. He found a narrowing of the intervertebral space between the fourth and fifth lumbar vertebrae. The x-ray of claimant's left hip gave no evidence of any pathology there. He stated as a conclusion that the x-rays showed a healed fracture

or compression fracture in the first lumbar vertebra and he was suspicious of a mild compression deformity in the body of the second lumbar vertebra. The spurring of the margins was evidence of hypertrophic osteoarthritis and the narrowing of the fourth lumbar intervertebral space was due to atrophy of the disc or the space. Doctor Berland explained that when "you have a compression fracture of a vertebra you have some impaction, one part of the vertebra into another. * * * this can occur in any bone * * *. When this occurs you get a decrease in the diameter—I'd better say decrease in the height of the body of the vertebra." Q. "Doctor, when you have a compression fracture of a vertebra, does this have any effect on the surrounding disc and soft tissue, the surrounding soft tissue area around the spine?" A. "Yes." Q. "And might a compression fracture of a vertebra, as a result of the effect that it has on the surrounding soft tissue, produce pain?" A. "Yes." Q. "Could this pain be for a continuing period of time, that is, to the point you might say it is a permanent type of pain or permanent type of condition?" A. "Well, if the fracture—in the beginning the fracture will produce pain because you have a hemorrhage there and you have distension of both soft tissues or contusion within the soft tissue around the vertebra, and you also have some hemorrhage into the bone structure itself. This will produce pressure on the nerve endings and will produce pain. When this heals the pain should go away." * * * Q. "Getting back to that arthritis, could that be painful?" A. "Yes, that could be." Q. "Could that be a source of constant discomfort?" A. "Yes." Q. "Without there being anything to aggravate it?" A. "When you have this form of lipping and spurring on the margins of the vertebra, you can have involvement in the joints, that is, in the apophyseal joints of the lumbar spine, this can produce pain. Again it can vary from just discomfort to very severe pain." * * * Q. "That compression fracture, would that be—A. "These are healed. My guess would be that the fractures per se after they healed would not be painful." Q. "How old did you say those fractures are. Can you tell us?" A. "This would be very difficult for me to say. They are healed. The only thing I could say is that healing may take six months, eight months for it to heal, something like that. How long before that it existed I don't know." Q. "When they are compressed would they be painful?" A. "You mean at the time?" Q. "Yes." A. "At the time of the compression. Yes they should be." Q. "Would there be almost immediate—" A. "Well, it again depends—I would say he would begin to feel it in a matter of 24 hours, * * *." Q. "There is no way to determine by looking at that picture whether it is a year old, five years old—" A. "No, this would be very difficult to evaluate." * * * Q. "Then if he doesn't report any back pain for seven or eight days, it would be sort of a long shot then he had a fracture in that particular instance?" A. "Well, again, if he were ambulatory; I mean, we are hypothesizing here, but if he were ambulatory and he were up and about and didn't have pain for about a week and then began having pain and you x-rayed this, my feeling would be this is not necessarily a compression fracture but that it probably was aggravated, the pre-existing condition was aggravated and as a result he was complaining of pain of this pre-existing condition." * * * Q. "In any event, just looking at the films, you can't put a date on when this thing happened?" A. "No. No. The only thing I can say here is that there is a healed fracture in L–1 an I am suspicious of a healed fracture in L–2, and beyond that I would say it would be difficult to say whether this was a year, two years or five years." * * * Q. "How would you characterize the arthritic spur that you saw there in the way of mild or great or—" A. "I would say it was moderately severe." Q. "Moderately severe." A. "Because he has quite a bit of spurring there." Q. "Is that compatible with the age of 71 years?" A. "Oh, yes." Q. "Would you expect a person 71 years, with

that amount of spurring, to have some discomfort?" A. "Yes." Q. "Without there being any outside source?" A. "That is right."

Dr. William A. Stephens, orthopedist, witness for the claimant, took a history of complaints from claimant and proceeded to examine him on February 16, 1965. Claimant complained of aching pain in the lower part of the back above the waist line, "the pain being constant but aggravated by bending, stooping and heavy lifting." The physical examination revealed mild, diffuse palpable tenderness from the level of the lower dorsal region and including the lumbar segments with maximum tenderness over the fifth lumbar interspace, and some palpable tenderness over the left greater trochanter of the femur. X-rays were taken by Doctor Stephens, who interpreted them as follows: In the lower dorsal and upper lumbar region there is a curvature with convexity to the left side. The anterior diameter of D11 is decreased as compared to D10 and D12. Anterior wedging of D11; D10 and D12 are quadrangular shaped in comparison. Some lateral wedging of both L1 and L2 on the concave side of the curve. Osteoarthritis of moderate degree. Extreme degree of lipping, in some instances almost bridging the intervertebral disc spaces of the lower dorsal including most of the lumbar segments. The intervertebral disc space between L4 and L5 is decreased. Has some degenerative changes associated with the mid-dorsal vertebral bodies. Wedging deformity of the superior aspect of L1. "We note rather marked degenerative changes associated with the remainder of the lumbar vertebral bodies. * * * We have three, four, five lumbar vertebrae—shows rather marked degenerative changes associated with the anterior borders of the remainder of the lumbar vertebral bodies." No pathology associated with the hips; joint surfaces are smooth and spaces normal in width.

Doctor Stephens' diagnosis was: "Old healed compression fractures of D11 and L1 with an associated mild scoliosis. (2) Os-teoarthritis of moderate severity of the lower dorsal and lumbar segments with marked narrowing of the intervertebral disc space between L4 and L5. And residuals of trochanteric bursitis of the left thigh manifested by tenderness. * * * He may be having some nerve root irritation on the left side as the history suggests; however, at the present this is not a prominent symptom. He has had arthritis of the spine for many years, and this, undoubtedly, has been present prior to the accident—date of the accident." He was of opinion that claimant had a permanent partial disability of the man as a whole of about 40% in regard to the present condition of the lower back.

Questioned in direct examination about the "old healed compression fractures", Doctor Stephens testified:

"Q. When you say 'old', doctor, are you able to precisely pin point from the x-rays how old they are?

A. No.

Q. They might be six months old; they might be a year and a half old, is that correct, or could be ten years old?

A. Yes.

Q. There is no way of precisely pin pointing the period of time, is that correct?

A. That is correct."

He stated further that "The fractures of D11 and L1 may have occurred as a result of the trauma he sustained in this accident. Generally, his present symptoms are the result of fractures of the spine plus the presence of degenerative arthritis which is, undoubtedly, aggravated by the fall which he sustained." He was then asked, "Now, does a history of a traumatic incident aid you in your diagnosis as to pin pointing the time [of the fractures]?" A. "Of the back?" Q. "History of injury to the back, yes." A. Yes, it would help out."

Counsel then propounded the hypothetical question which included the assumption "that somewhere between two days and eight days he experienced now pain in his low back." The witness responded: "I am of the opinion that the fractures of D11 and L1, within a reasonable degree of medical certainty, were caused by this fall, and that he has had an aggravation of this pre-existing arthritic condition of his back as the result of the trauma." Then upon the basis of the same hypothetical question he stated it as his opinion that claimant "has got some disability of the back that was caused by this accident of approximately 30% of the man as a whole."

If we could stop at this point it might well be said that there was sufficient competent evidence for a finding that the compression fractures were caused by the accident here and that the pain existent in claimant's back was caused in part by those fractures. However we believe that the cogency—perhaps even the relevance—of the opinion evidence of Doctor Stephens as to the fracture causation has suffered a process of regression by reason of his subsequent testimony. That subsequent testimony is here detailed.

"Q. At the time these fractures occurred, would the patient suffer some discomfort from that?

A. Yes, he should have had considerable amount of pain in his back at the time.

Q. When would it occur in relation to the time it occurred?

A. The onset of pain?

Q. Yes.

A. Should have been almost immediately." *

[We digress here only long enough to repeat claimant's own testimony that at the time of the fall he was bothered only by the soreness of his hip, that the next day he was having no trouble with any part of his body other than his hip, that his back started "bothering" him two or three days after the fall and that when asked directly when he first started having pain in his back he answered that it was seven or eight days after his visit to Doctor Donley's office].

Proceeding with Doctor Stephens' subsequent testimony:

"Q. Now, assuming, doctor, that this man didn't have any pain in his back for seven or eight days after this particular accident, would that lead you to believe that he didn't suffer these fractures or compression fractures of the vertebrae at that time?

A. Well, it would be doubtful, if the back was absolutely symptom free for eight days following trauma, the occurrence of fractures at the time of the accident would be doubtful, yes.

Q. You would normally expect he would have pain, react to pain say within hours or, at least, one day, is that right?

A. Yes."

\* \* \* \* \* \*

"Q. Now, doctor, if we will make another assumption, if this man had complaints of his right or his left leg and hip immediately following this and these continued on and he received treatment

---

* On this subject Doctor Berland had previously testified: "Q. When they are compressed would they be painful? A. You mean at the time? Q. Yes. A. At the time of the compression. Yes, they should be. Q. Would there be almost immediate— A. Well, it again depends—I would say he would begin to feel it in a matter of 24 hours \* \* \*."

The employer's medical witnesses testified: Doctor Scheer, orthopedic surgeon— "In traumatic compressions one would expect to have virtually immediate pain." Doctor Donley—"How soon would that pain show up? Should show up like any fracture, immediately."

at the dispensary until from January, would be until May of that year, and then didn't return again until October, and at that time for the first time mentioned any complaints in his back, would you have an opinion, doctor, as to whether or not he suffered any injury to his back as a result of this fall?"

\* \* \* \* \* \*

"A. No."

"Q. You would say he would not have any disability to his back as a result of this fall, is that right?

"A. Not after that interval."

The hypotheses of the latter questions put to the witness were well justified by uncontradicted testimony found in the record. The effect then of Doctor Stephens' later testimony is to completely neutralize his previous opinion that the fall furnished the causation for any back disability from which claimant may suffer.

We are left then only with the testimony of claimant himself as to the continuing intermittent soreness and discomfort in his back. In view of claimant's own evidence (i. e., of his medical witness) that the long existent arthritic condition of his spine could produce pain without the presence of any external factor, it would be mere speculation to conclude that any pain which he may currently experience was caused by the fall in question.

Applying the Constitutional test of "competent and substantial evidence upon the whole record" (Art. V, Sec. 22, V.A.M.S.), we find that the award of the Commission was not supported by such competent and substantial evidence. In the words of the Compensation Act "there was not sufficient competent evidence in the record to warrant the making of the award" (§ 287.490, RSMo 1959, V.A.M.S.).

The judgment of the Circuit Court should be reversed and the cause remanded to that Court with directions to vacate the award of the Industrial Commission and to enter judgment for appellant-employer.

PER CURIAM.

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, the judgment of the Circuit Court is reversed and the cause remanded to that Court with directions to vacate the award of the Industrial Commission and to enter judgment for appellant-employer.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.